FERNDALE HEIGHTS UTILITIES CO., Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

First District (2nd Division)   No. 62301

Opinion filed December 21, 1976.

Chapman and Cutler, of Chicago (John N. Vander Vries and Daniel J. Kucera, of counsel), for petitioner.

J. M. Bumgarner, of Environmental Protection Agency, of Springfield, for respondents.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

This action involves a petition by Ferndale Heights Utilities Co. (hereinafter "Ferndale") for review of an order of the Illinois Pollution Control Board (hereinafter "Board") which found that petitioner has allowed the emission of sound beyond its property boundaries so as to cause noise pollution in violation of Rule 102 of the Illinois Noise Regulations and section 24 of the Environmental Protection Act. (Ill. Rev. Stat. 1973, ch. 111½, par. 1001 *et seq.*) The Board's order was based upon a complaint filed by the Illinois Environmental Protection Agency (hereinafter "Agency") which alleged that violations of the Act occurred on each day of company operation between August 10, 1973, and August 6, 1974. The Board also directed that Ferndale pay a civil penalty in the amount of $500.

From entry of the order finding it guilty of noise pollution and the assessment of a penalty thereon, Ferndale appeals contending (1) that Rule 102 of the Illinois Noise Regulations is invalid and contrary to the Act, (2) that the Board's finding of Ferndale's violation of Rule 102 is contrary to the manifest weight of the evidence, and (3) that the imposition of a civil penalty was arbitrary and excessive.

In lieu of protracted litigation the parties have submitted stipulations of fact. As detailed in these stipulations, Ferndale was organized as a corporation in 1957 for purposes of providing public utility water and sanitary sewer service in various areas, including what is now known as Pinehurst Manor Subdivision in Cook County, Illinois. This subdivision borders Ferndale's Long Grove Road Pumping Station.

The Long Grove Pumping Station was built in 1969 and equipped with a natural gas powered engine so as to guarantee uninterrupted service for Ferndale's 2,500 customers, including approximately 400 customers in the Pinehurst Manor Subdivision.

On October 10, 1973, the Agency informed Ferndale that complaints had been received with respect to noise emanating from the Long Grove Pumping Station and that measurements of noise emanating from the pump house, when taken upon a complainant's property, indicated a possible violation of Rule 102. Shortly thereafter, Ferndale retained a firm of consultants to investigate the situation.

On October 22, 1973, Ferndale responded to the Agency's inquiry and indicated that it was in the process of studying the problem and requested that the Agency provide relevant noise survey data. On November 2, 1973, the Agency complied with this request.

On December 7, 1973, the Agency informed Ferndale that the matter had been transferred to the Agency's Enforcement Services Section for prosecution and invited further response as to Ferndale's intent. By letter of December 19, 1973, Ferndale denied that it was committing noise pollution; suggested that certain individuals had complained to the Agency in revenge of a recent rate increase; and indicated that it would develop a plan to muffle the engine and submit such specifications to the Agency for approval. On June 1, 1974, Ferndale retained the firm of Edward D. Newell to design, fabricate and install the necessary equipment and assumed that the work would proceed forthwith.

On August 6, 1974, the complaint in the instant action was filed. Two days later, Ferndale was advised by the Newell Co. that it had halted all operations in the noise control area of its business. Ferndale thereupon retained another firm to complete the requisite work.

On September 6, 1974, the Agency advised Ferndale that it sought a reduction in noise to a point twice the ambient noise level in the area when the engine was not operating. Settlement negotiations were held on September 6, 1974, and September 11, 1974. As a result of these meetings a compliance program was established so as to reduce the level of noise emitted by Ferndale's operations which allegedly unreasonably interfered with lawful activities in the area. This stipulation was presented at the public hearing on this matter held on September 24, 1974, and on the next day was formally submitted to the Pollution Control Board.

Between October 29, 1974, and January 10, 1975, the parties submitted written arguments to the Board. On June 4, 1975, the parties filed an additional stipulation to the effect that as of May 11, 1975, measurements taken in the vicinity of the pumping operation indicated that Ferndale had fully complied with the compliance program. In an opinion dated July 10, 1975, the Board found that Ferndale had committed noise pollution as charged, in violation of Rule 102 and section 24 of the Act and directed that Ferndale pay a civil penalty in the amount of $500.

Under the terms of the party's agreement, the stipulated testimony of twelve citizen witnesses was introduced for the Board's consideration.

Ronald and Sharon Stander have resided at 844 Holly Way in Palatine, Illinois, for approximately 8 years. During the course of their residence the Standers began hearing a noise from the pumping station which was built 9 feet from their property line. The noise is described as a low-pitched sound which develops into a loud, high-pitch, whining sound. The noise may be heard at all hours of the day and night both inside and outside their home. During a 24-hour period the noise may be experienced eight times with a duration of 1 to 2 hours. The Standers described the noise as "a source of great irritation" which has forced them to shut windows and forego the use of their backyard for relaxation and entertainment and that the sound "has many times awakened us from sleep at night."

June Burger and Joyce Brundage moved into a house at 838 Holly Way on April 15, 1974, unaware of any noise from the pumping station. However, on that date they became aware of "that great source of irritation" and have experienced the noise approximately six times in a 24-hour period. They describe the noise emanating from the pumping station as akin to "ten air conditioners running at the same time." The noise has awakened them from sleep on occasion and has resulted in their inability to utilize their patio.

Thomas J. Pastrnak also initially noticed the noise after he moved into his home at 832 Holly Way. The noise disturbs him when he is engaged in conversation outside his house. The "whining and pumping sound" has caused him to go inside and close his windows on several occasions.

Thomas Pierson, of 1937 Long Grove Road, heard a "raspy, unclear noise" emanating from the pumping station when he occupied his home on April 14, 1974. The noise, characterized as a "pump-pulsating, throbbing," occurred constantly during the summer so as to preclude use of his yard for relaxation or entertainment.

Mary Consoer has lived at 807 Gardenia for 5 years, during which time she heard a noise described as "a lawnmower running all day directly under my window." She heard the noise every day of the week, 24 hours a day, except for short intervals when "its off"; has been awakened from sleep at least once a week; has had difficulty in using the telephone; and has been prevented from using her backyard due to the noise.

Raymond Joos occupied a residence at 1937 Long Grove Road from 1970 until April 15, 1974. The pumping station is located approximately 10 feet from his former property line and 40 feet from the former Joos residence. Although Joos was aware of the pumping operations during his residency, he indicated that at no time was he bothered or annoyed by sounds, noise, and vibrations emanating from the well house.

Another former resident of the area, Robert Winstead, occupied a residence at 832 Holly Way from 1970 until August 28, 1973. The pumping

station is located approximately 125 feet from the lot's property line and 175 feet from the former Winstead residence. Aware of the pumping operations, Winstead indicated that he was never disturbed by any noise or vibrations during his residency.

Frank Keraly has occupied a residence in the vicinity since 1970. The well house is located approximately 200 feet from his property and 250 feet from his house. Like Joos and Winstead, Keraly was aware of and not disturbed by the pumping operations.

Robert Brown occupied a residence at 838 Holly Way from 1970 until November 1972, at which time Robert Pryun became the occupant. Pryun's tenure lasted until April 16, 1974. This property adjoins the Long Grove Pumping Station and is separated from the well house by 50 feet. Both Brown and Pryun were aware of and unaffected by the pumping operations.

Ray Di Vito, an officer of Ferndale and supervisor of the Long Grove plant also testified and indicated that he attends the pumping station daily; that the operation is an efficient one and has reduced the operating expenses of Ferndale which are ultimately borne by its customers; and that Ferndale possessed sufficient available assets with which to effect the required sound reducing facilities. Di Vito also indicated that his residence is located 850 feet from the plant and that he is unaffected by the operation of the plant. According to Di Vito he is unable to hear the pump operating from immediately outside the station when he is inside a vehicle with the windows closed and, in his opinion, no unreasonable noises or vibrations emanate from the Long Grove Pumping Station.

Before proceeding with our determination of the substantive issue in this proceeding, we must dispose of several disputes regarding the interpretation of Noise Regulations and the Environmental Protection Act. Ferndale initially contends that the Board erred in finding a violation of the Act since Rule 102 as interpreted and applied by the Agency is contrary to law. Section 24 of the Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1024) and Rules 102 and 101(j) of the Noise Regulations provide *inter alia*:

> "§24. No person shall emit beyond the boundaries of his property any noise that unreasonably interferes with the enjoyment of life or with any lawful business or activity, so as to violate any regulation or standard adopted by the Board under this Act."

> "Rule 102: *PROHIBITION OF NOISE POLLUTION.*

> No person shall cause or allow the emission of sound beyond the boundaries of his property so as to cause noise pollution in Illinois, or so as to violate any provision of this Chapter of the Illinois Environmental Protection Act."

> "Rule 101(j) Noise pollution: the emission of sound that

unreasonably interferes with the enjoyment of life or with any lawful business or activity."

In addition to these rules, the Board has promulgated certain regulations establishing particular numerical levels in specific "property-line noise source" applications. These numerical limitations are codified in Rule 202 of the Illinois Noise Regulations.

■■ Ferndale's contention that Rule 102 is contrary to the terms of the Act has been effectively refuted by the opinion of the Illinois Supreme Court in *Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill. 2d 305, 319 N.E.2d 782. Rule 102, as construed in *Coal Operators Association*, simply prohibits emissions that unreasonably interfere with life or activities whether such emissions violate Section 24 generally or a particular Board regulation. We find nothing in the Act to preclude prosecution of noise pollution under Rule 102. (See *Shell Oil Co. v. Pollution Control Board* (1976), 37 Ill. App. 3d 264, 346 N.E.2d 212.) The effect of compliance with the numerical standards established by Rule 202 is without bearing in the instant case inasmuch as no such compliance was demonstrated. No other considerations with respect to the Board's application of Rule 202 are properly before the court for current consideration.

Ferndale also suggests that Rule 102 is unconstitutional and a denial of due process of law for the reason that it does not contain sufficient standards for determining what constitutes "noise pollution." Noise pollution, as previously noted, is defined in Rule 101(j) as "the emission of sound that unreasonably interferes with the enjoyment of life or with any lawful business or activity." Section 33(c) of the Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1033(c)) provides:

"(c) In making its orders and determinations, the Board shall take into consideration all the facts and circumstances bearing upon the reasonableness of the emissions, discharges or deposits involved including, but not limited to:

(i) the character and degree of injury to, or interference with the protection of the health, general welfare and physical property of the people;

(ii) the social and economic value of the pollution source;

(iii) the suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved; and

(iv) the technical practicability and economic reasonableness of reducing or eliminating the emissions, discharges or deposits resulting from such pollution source."

We hold that section 24 and Rule 102, when read in conjunction with

section 33(c), contain sufficient standards to accord petitioner due process of law. In view of the broad range of the subject matter a more precise definition could hardly be constructed. See *City of Monmouth v. Pollution Control Board* (1974), 57 Ill. 2d 482, 313 N.E.2d 161.

Ferndale further suggests that, within this context, the application of certain mutually agreed upon noise levels as part of a compliance program constitutes an arbitrary and *ad hoc* promulgation of "standards" under Rule 102. Such a compliance program, however, serves only as a negotiated settlement plan, as stipulated between the parties, to effect the remedial purposes of the statute in an individual case. Ferndale's intimation that such negotiated stipulations are presumptively invalid due to unequal bargaining strengths between the parties is without citation to case law and is similarly without textual support in the record of the case at bar. Consequently, these contentions must be rejected.

Ferndale next asserts that the Board's order should be reversed because its finding of a violation of Rule 102 is contrary to the manifest weight of the evidence. Specifically, Ferndale argues that the Pierson testimony failed to provide dates and times of noises, failed to show any disturbance in his house, failed to show physical damage to himself or any person or property, failed to show that he never lounged or entertained guests in his yard and failed to show when and how often he did not lounge or entertain guests in his yard. Other alleged testimonial deficiencies involve failure to cite dates and times when activities such as patio parties were prevented or when the various witness' sleep was interrupted.

However, agency witnesses used such terms as "almost constant this summer," "five times this past summer" and "awakened once or twice this year" to describe generally how often they were disturbed by the noise emanating from the pumping station. Terms such as "a great source of irritation," "disturbing," "like ten air conditioners running at the same time" and "[like] a lawnmower running all day under my window" were used to describe the effect of this sound upon the individuals.

Based upon such testimony the Board properly found that the character and degree of interference with the enjoyment of life and lawful activity occasioned by sounds emanating from Ferndale's pumping operations to be "unreasonable." Our review of the record does not mandate a contrary conclusion.

■■ Nor can it be said that in reaching this conclusion the Board failed to consider and render adequate findings as required by section 33. Sufficient evidence was adduced at the hearing as to each enumerated factor to support the Board's ruling. (*Lloyd A. Fry Roofing Co. v. Pollution Control Board* (1974), 20 Ill. App. 3d 301, 314 N.E.2d 350.) The Board specifically ordered that its opinion be read so as to constitute its findings of fact and conclusions of law. Based upon the evidence

previously alluded to, the Board specifically assessed the character and degree of injury to or interference with the protection of health occasioned by Ferndale's activities; the social and economic value of the pollution source; the suitability of the source to the locale; and the technical practicability and economic reasonableness of reducing or eliminating the emissions resulting from such pollution source. We concur in the Board's judgment.

Ferndale finally contends that the Board's assessment of a penalty in the amount of $500 is arbitrary and excessive.

In *Metropolitan Sanitary District v. Pollution Control Board* (1975), 62 Ill. 2d 38, 45, 338 N.E.2d 392, 397, the Supreme Court addressed this problem as follows:

> "Although this court recognized the authority of the Board to impose monetary penalties in *City of Waukegan v. Pollution Control Board*, 57 Ill. 2d 170, we have since held that the Act does not confer upon the Board authority to impose a penalty in every case of a violation of the Act or regulations. (*Southern Illinois Asphalt Co. v. Pollution Control Board*, 60 Ill. 2d 204, 208.) In *City of Monmouth v. Pollution Control Board*, 57 Ill. 2d 482, we held that the principal reason for the imposition of civil penalties under the Act is to provide a method to aid in the enforcement of the Act and that punitive considerations are secondary."

■■ In *Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 204, 208-09, 326 N.E.2d 406, 408-09, it is noted:

> "* * * [T]he standards of section 33(c) are also relevant standards which the Board must consider in mitigation or aggravation in determining the particular action to be taken or penalty to be imposed under section 33(b) of the Act.
>
> * * * Implicit in the grant of the discretionary authority to impose monetary civil penalties in varying amounts is the requirement that the severity of the penalty should bear some relationship to the seriousness of the infraction or conduct. [Citation.] In determining if a civil penalty is warranted and, if so, the amount of the penalty, the Board must be governed by the considerations required by section 33(c)."

A review of the opinion of the Board in the case at bar fails to establish that the standards of section 33(c) were considered by the Board in relation to the imposition of its $500 assessment against Ferndale. Indeed, the text of the opinion fails to suggest any reasoned basis for such an assessment. Any number of bases for the penalty imposed could be arrived at if one would indulge in conjecture, however, the penalty statute does not authorize such conjecture. (*Central Illinois Light Co. v. Pollution Control Board* (1974), 17 Ill. App. 3d 699, 308 N.E.2d 153.) Consequently,

the order of the Board directing payment of $500 as a civil penalty must be vacated. However, the order of the Board finding Ferndale in violation of Rule 102 and section 24 of the Act is affirmed.

Affirmed in part and reversed in part.

DOWNING and JIGANTI, JJ., concur.