DISCOVERY SOUTH GROUP, LTD., *et al.*, Petitioners-Appellants, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents-Appellees.

First District (1st Division)    No. 1—93—1438

Opinion filed August 28, 1995.—Rehearing denied October 23, 1995.

548

Samuel J. Vinson, Michael Schneiderman, Christopher W. Zibart, Kathleen M. Burch, and Adam M. Kingsley, all of Hopkins & Sutter, of Chicago, for petitioners.

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, and Daniel N. Malato, Assistant Attorney General, of counsel), for respondent Pollution Control Board.

Michael F. Dolan, Ellen D. Gregory, Tina M. Tabacchi, and James F. Kosciolek, all of Jones, Day, Reavis & Pogue, of Chicago, for respondent Village of Matteson.

JUSTICE WOLFSON delivered the opinion of the court:

Robert Frost wrote: "Good fences make good neighbors." But what happens when the problem is not something that can be contained by a fence? And when the right of one neighbor to conduct its business enterprise must be measured against the other neighbor's enjoyment of life?

The World Music Theater, an outdoor amphitheater located in

Tinley Park, Illinois, opened for business on June 2, 1990. It became immediately apparent to some of the residents of the neighboring towns of Matteson (Matteson) and Country Club Hills (CCH) that the World Music Theater was going to be a problem. Excessive noise was emanating beyond the boundaries of the amphitheater, interfering with their lives and activities.

On August 2, 1990, the Village of Matteson filed a complaint with the Illinois Pollution Control Board (Board) against the owners and operators, Discovery South Group Ltd., Music Center Associates Limited Partnership, and Tinley Park JAM Corp. (collectively referred to as the Theater), alleging violations of the Illinois Environmental Protection Act (the Act) (415 ILCS 5/1 *et seq.* (West 1992)). Proceedings on the complaint spanned three years, encompassing several hearings.

An interim order was issued on April 25, 1991, and on February 25, 1993, the Board entered its 59-page final opinion and order. In it the Board concluded that the Theater had violated section 24 of the Act (415 ILCS 5/24 (West 1992)) and sections 900.101 and 900.102 of the Illinois Administrative Code (the Code) (35 Ill. Adm. Code §§ 900.101, 900.102 (1994)) on 26 occasions during 1990, 1991 and 1992.

To insure future compliance, the final order required the Theater to conduct sound monitoring during all theater events for three years from the date of the order. A minimum of three monitoring stations was mandated. Monitoring equipment and procedures prescribed by Code regulations were to be used. The order established specific sound level restrictions. A $13,000 civil penalty for violations that occurred in 1991 and 1992 was imposed.

The Theater has petitioned this court for review of the Board's final order in accordance with section 41 of the Act (415 ILCS 5/41 (West 1992)) and raises two issues: (1) whether the Board's finding that the Theater violated section 24 of the Act and sections 900.101 and 900.102 of the Code is against the manifest weight of the evidence, and (2) whether the remedy fashioned by the Board imposes stricter standards upon the Theater than provided for in the applicable regulations and is arbitrary, unduly restrictive, and violative of the Theater's State constitutional rights to freedom of speech and equal protection.

## I. THE VIOLATION

■ The Board found that the Theater violated section 24 of the Act and sections 900.101 and 900.102 of the Code. Section 24 of the Act states:

"No person shall emit beyond the boundaries of his property any noise that unreasonably interferes with the enjoyment of life or with any lawful business or activity, so as to violate any regulation or standard adopted by the Board under this Act." 415 ILCS 5/24 (West 1992).

Title 35, subtitle H, chapter I, part 900, of the Code contains the general provisions of the Pollution Control Board, implementing section 25 of the Act, as authorized by section 27 of the Act.[1] Section 900.101 of the Code defines noise pollution as "the emission of sound that unreasonably interferes with the enjoyment of life or with any lawful business or activity." (35 Ill. Adm. Code § 900.101 (1994).) Section 900.102 of the Code, entitled "Prohibition of Noise Pollution," states in pertinent part:

"No person shall cause or allow the emission of sound beyond the boundaries of his property *** so as to cause noise pollution in Illinois, or so as to violate any provision of this Chapter." 35 Ill. Adm. Code § 900.102 (1994).

These provisions of the Act and Code have been interpreted by the Illinois Supreme Court as:

"prohibiting emissions that unreasonably interfere with life or activities, whether such emissions may be said to violate section 24 generally or whether they are emissions which more specifically may be said to violate a particular Board regulation *** by exceeding, for example, the maximum permissible decibels which may be by a regulation emitted to a certain classification of land." *Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill. 2d 305, 309-10, 319 N.E.2d 782.

See also *Ferndale Heights Utilities Co. v. Pollution Control Board* (1976), 44 Ill. App. 3d 962, 358 N.E.2d 1224.

In the present case, no numeric data concerning noise emissions by the Theater were relied on by the Board to determine a violation. In reaching its decision that the Theater violated the cited provisions of the Act and Code, the Board relied on testimonial accounts of how noise emissions from the Theater interfered with the enjoyment of life.

During hearings that were held, a number of Matteson residents described how the noise emanating from the Theater during various concerts or events was so loud that it disturbed their sleep and the sleep of their children, even though the windows of their homes were

---

[1]Sections 25 and 27 of the Act authorize the Board to adopt regulations "prescribing limitations on noise emissions beyond the boundaries of the property" and delineate the manner in which this is to be done. 415 ILCS 5/25, 27 (West 1992).

closed and air conditioners were running. One person reported feeling vibrations from the music while in his own home. Several persons reported that the walls of their home vibrated and windows rattled. Others were unable to hear their televisions, when playing at regular volume, over the noise from the Theater. The noise forced some persons to retreat indoors or caused them to limit their use of their own backyards.

■ Testimonial accounts of a similar nature have been found to be sufficient to support a Board finding that a noise source caused pollution. In *Ferndale Heights Utilities Co. v. Pollution Control Board* (1976), 44 Ill. App. 3d 962, 358 N.E.2d 1224, this type of narrative evidence of unreasonable interference with enjoyment of life and activities constituted proof of a violation by a property line noise source. There was no need to show that the noise source exceeded numerical limitations.

Conceding the viability of the narrative standard, the Theater argues that the admissible evidence presented in this case was insufficient to justify a finding that it emitted noise pollution pursuant to section 24 of the Act. The Theater contends (1) hearsay evidence was received and relied upon by the Board in reaching its decision, (2) the testimony properly received did not justify a finding that the sounds emanating from the Theater constituted noise pollution, and (3) the Board did not properly consider all of the factors found in section 33(c) of the Act.

STANDARD OF REVIEW

■ The standard by which this court reviews a decision of an administrative agency is the manifest weight standard. (*Environmental Protection Agency v. Pollution Control Board* (1993), 252 Ill. App. 3d 828, 624 N.E.2d 402.) The reviewing court's function is to ascertain whether the findings and decision of the agency are against the manifest weight of the evidence. (*Murdy v. Edgar* (1984), 103 Ill. 2d 384, 391, 469 N.E.2d 1085; *Davern v. Civil Service Comm'n* (1970), 47 Ill. 2d 469, 471, 269 N.E.2d 713; *Middleton v. Clayton* (1984), 128 Ill. App. 3d 623, 630, 470 N.E.2d 1271.) An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. (*Whelchel v. Edgar* (1990), 195 Ill. App. 3d 406, 409, 552 N.E.2d 394; *Burke v. Board of Review, Illinois Department of Labor* (1985), 132 Ill. App. 3d 1094, 1100, 477 N.E.2d 1351; *Petraitis v. Board of Fire & Police Commissioners* (1975), 31 Ill. App. 3d 864, 867, 335 N.E.2d 126.) A decision is not against the manifest weight of the evidence and must be sustained if any evidence fairly supports the determination of the administrative agency.

(*Farmers State Bank v. Department of Employment Security* (1991), 216 Ill. App. 3d 633, 576 N.E.2d 532.) The reviewing court must not reweigh the evidence or make an independent determination of the facts. (*Abrahamson v. Illinois Department of Professional Regulation* (1992), 153 Ill. 2d 76, 88, 606 N.E.2d 1111.) The mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings. (*Petraitis*, 31 Ill. App. 3d at 867.) If the record contains evidence to support the agency's decision, it should be affirmed. *Abrahamson*, 153 Ill. 2d at 88-89.

### (1) RELIANCE ON HEARSAY EVIDENCE

The Theater first argues that the Board's determination was against the manifest weight of the evidence because the Board relied on inadmissible hearsay evidence.

The evidence which the Theater claims to be inadmissible hearsay consists of two exhibits containing compilations of telephone complaints received by the Matteson police department and a third exhibit consisting of copies of a series of letters, sent to the Theater by the Country Club Hills city manager, which contains a compilation of telephone complaints received by the CCH police department.

The Theater presented this same hearsay claim to the Board in its motion for reconsideration. The Board affirmed the hearing officer's admission of the evidence, finding that (1) these documents were admissible under the public records exception to the hearsay rule, (2) the documents were admissible under the rules of administrative procedure, (3) the Theater was estopped from challenging the admissibility of the documents because it presented a similar exhibit showing dates and locations of complaints, based upon the same police reports, and (4) that even if the documents were inadmissible, it was harmless error to have admitted them because the Board would have reached the same determination without the evidence.

■ Section 10—40(a) of the Illinois Administrative Procedure Act (5 ILCS 100/10—40(a) (West 1992)), the administrative rule relied upon by the Board, states:

> "The rules of evidence and privilege as applied in civil cases in the circuit courts of this State shall be followed. Evidence not admissible under those rules of evidence may be admitted, however, *** if it is of a type commonly relied upon by reasonably prudent men in the conduct of their affairs."

This court agrees that a reasonably prudent person would find a tabulation of the local police department's log regarding telephone complaints trustworthy and reliable. Therefore, we find that the

documents at issue here were admissible under the rules of administrative procedure.

But even if the documents had been inadmissible hearsay, reversal would not be required. In *Abrahamson v. Illinois Department of Professional Regulation* (1992), 153 Ill. 2d 76, 94, 606 N.E.2d 1111, the court quoted *Goranson v. Department of Registration & Education* (1980), 92 Ill. App. 3d 496, 501, 415 N.E.2d 1249, for the proposition:

> " 'Generally, hearsay evidence is not admissible in an administrative proceeding. [Citation.] However, where there is sufficient competent evidence to support an administrative decision, the improper admission of hearsay testimony in the administrative proceeding is not prejudicial error.' "

In the present case sufficient competent evidence was presented and relied upon by the Board in reaching its determination. The Board said it was willing to put aside the disputed hearsay to reach its decision. The admission of the three documents, even if error, would not warrant reversal of the Board's ruling.

### (2) SUFFICIENCY OF RESIDENT TESTIMONY

Matteson merely had to show, by a preponderance of the evidence, that noise emitted by the Theater during concerts or other events unreasonably interfered with enjoyment of life and lawful activities. The evidence came from several Matteson residents, who testified concerning the effect that the Theater noise had on their lives. The Theater suggests, however, that these witnesses were not a representative sampling because they were "hypersensitive" to noise. The Theater argues that the testimony presented did not satisfy "the objective standard which must be employed" when determining the reasonableness of the noise emissions.

It is true that some residents testified that they were not bothered by the noise from the Theater. It is also true that there was a general acknowledgement, at later hearings, that there had been a reduction in concert noise over time. But neither of these facts warrants a finding that the Board's determination was against the manifest weight of the evidence.

Section 33(a) of the Act states:

> "It shall not be a defense to findings of violations of the provisions of the Act or Board regulations or a bar to the assessment of civil penalties that the person has come into compliance subsequent to the violation ***." 415 ILCS 5/33(a) (West 1992).

Furthermore, to show "unreasonable interference" Matteson was not required to show that all of its citizens were affected or that

those affected were affected to the same degree. Matteson merely had to show that noise emissions from the Theater caused unreasonable interference with the enjoyment of life for some of its residents. This, Matteson did.

At hearings held in December 1990, 14 individuals testified that they were disturbed by noise from the Theater. It interfered with sleep, reading, watching television and the ability to conduct normal conversation. Three Matteson village trustees, in addition to being personally bothered by the noise, testified that they received numerous complaints at their homes regarding the noise coming from the Theater. The CCH city manager testified that, on a single night, the CCH police department received 76 citizen complaints regarding noise from the Theater.

During June 1992 hearings, six residents of Matteson testified that noise from the Theater was so loud that they often felt as if they were at the concert. At December 1992 hearings, 25 residents testified, several reporting that they had been unable to sleep and felt vibrations from the music. One man could not sleep, even though he used ear plugs to muffle the noise. Matteson village trustees attested to the fact that they continued to receive phone calls from village residents regarding the booming noise and vibrations emanating from the Theater.

Even Matteson residents who were witnesses for the Theater, although they were not bothered by the music, testified that they could hear music from the Theater at their homes, which were located more than two miles from the Theater.

This testimony provides a sufficient basis for the Board's finding that the Theater was emitting noise pollution, as that term is defined by the Code. See *Ferndale Heights Utilities Co. v. Pollution Control Board* (1976), 44 Ill. App. 3d 962, 358 N.E.2d 1224.

### (3) CONSIDERATION OF SECTION 33(c) CRITERIA

■ The Theater next contends that the Board failed to properly consider each of the criteria listed in section 33(c) of the Act (415 ILCS 5/33(c) (West 1992)), which states:

"In making its orders and determinations, the Board shall take into consideration all the facts and circumstances bearing upon the reasonableness of the emissions, discharges or deposits involved including, but not limited to:

(i) the character and degree of injury to, or interference with the protection of the health, general welfare and physical property of the people;

(ii) the social and economic value of the pollution source;

(iii) the suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved;

(iv) the technical practicability and economic reasonableness of reducing or eliminating the emissions, discharges or deposits resulting from such pollution source; and

(v) any subsequent compliance."

The narrative testimony established that the Theater noise interfered with enjoyment of life and lawful activity. The Board had to determine whether that interference was unreasonable by referencing the section 33(c) factors. Proof of unreasonable interference does not require proof with respect to each of the criteria listed in section 33(c). See *Marblehead Lime Co. v. Pollution Control Board* (1976), 42 Ill. App. 3d 116, 355 N.E.2d 607.

In this case, however, the Board did specifically address each of these factors in its interim order and, again, in its final order stated:

"The Board specifically readopts the evaluation of the Section 33(c) factors in the interim opinion and order dated April 25, 1991. That evaluation is modified by the discussion of technical practicability and economic reasonableness contained in the remedy section of this opinion (See Section 33(c)(4)) and the evaluation of the previously described testimony to the effect that the Theater has not yet achieved the reduced sound levels necessary to avoid substantial annoyance throughout the community (See Section 33(c)(5))."

A close reading of the Theater's arguments on this issue indicates that the Theater does not deny that evidence was received by the Board on each of the section 33(c) factors, but that the Board "ignored" the evidence concerning the Theater's economic value, the appropriateness of the location, and the economic feasibility of requiring compliance. In other words, the Theater is unhappy with the weight that the Board assigned to certain factors.

As noted earlier, however, judicial review of an agency determination is limited. It is not within the province of the reviewing court to reweigh evidence. (*Launius v. Board of Fire & Police Commissioners* (1992), 151 Ill. 2d 419, 603 N.E.2d 477; *City of Highland v. Pollution Control Board* (1978), 66 Ill. App. 3d 143, 383 N.E.2d 692.) If any evidence fairly supports the action of the administrative agency, its decision is not against the manifest weight of the evidence and must be sustained. *Environmental Protection Agency v. Pollution Control Board* (1993), 252 Ill. App. 3d 828, 624 N.E.2d 402.

In light of this standard, this court has no basis for reversing the Board's determination that the Theater has been emitting noise pollution in violation of the relevant sections of the Act and Code.

## II. THE REMEDY

It is clear from the Theater's brief that it is not the violation, but the remedy, that causes the most concern. The Theater devotes much of its argument on appeal to challenging the remedy the Board has fashioned, specifically, the reference time for measuring sound.

The Theater's arguments as to the remedy are: (1) the remedy is against the manifest weight of the evidence and invalid because it requires compliance with noise level standards that are stricter than the general standards set forth in the Act; (2) the remedy violates the Act because it is beyond the scope of the Board's powers; (3) the remedy is illegal rulemaking in violation of the Act; and (4) the remedy violates the Theater's constitutional right to equal protection and freedom of speech.

### STANDARD OF REVIEW

■ The appropriate standard for review of Board decisions depends on whether the Board was acting in a quasi-legislative or quasi-judicial capacity. (*Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 367 N.E.2d 684; *Environmental Protection Agency v. Pollution Control Board* (1983), 118 Ill. App. 3d 772, 455 N.E.2d 188.) When acting in a quasi-judicial capacity, the Board's decision should be reviewed by a court on the basis of whether it is against the manifest weight of the evidence. (*Environmental Protection Agency v. Pollution Control Board*, 118 Ill. App. 3d at 777.) When acting in a quasi-legislative capacity, the Board's decision will be upheld unless it is arbitrary, capricious, or unreasonable. *Environmental Protection Agency v. Pollution Control Board* (1981), 86 Ill. 2d 390, 427 N.E.2d 162.

■ The Board, when fashioning the remedy to be applied to the Theater, was interpreting its own rules and regulations, acting in its quasi-legislative capacity. Accordingly, this court must decide whether the Board's remedy is clearly arbitrary, unreasonable, or capricious. This court should also "accord substantial weight to the agency's construction and actual application of its own rule and should not interfere unless the agency's interpretation is plainly erroneous or inconsistent with long settled constructions." *Olin Corp. v. Pollution Control Board* (1977), 54 Ill. App. 3d 480, 483, 370 N.E.2d 3.

### 1. STRICTER COMPLIANCE

■ The Theater contends that the Board's final order is invalid because it is "inconsistent with" and "stricter than" the general regulations concerning noise emissions from property line noise sources. The short answer to this argument is that the Board did not

utilize a stricter *ad hoc* standard for determining whether the Theater had *violated* the Act. Therefore, the cases cited by the Theater are not helpful.

The Board's final order required the Theater to comply with section 901.102 of the Code and also required the Theater to "make all measurements by using procedures specified in 35 Ill. Adm. Code 900.103(b), *except that sound measurements shall be based on Leq averaging using a reference time of not more than 5 contiguous minutes comprised of sound data measured in 10 second blocks.*" (Emphasis added.)

The Board noted in its final order that the five-minute Leq averaging was a deviation from the general rules, but explained the reason for the deviation as follows:

> "The one hour averaging time is specified for monitoring continuous, reasonably steady sounds. However, the record clearly indicates that the concert sound cannot be classified as continuous and reasonably steady in nature. It is common practice for groups to perform for forty minutes, take a twenty minute break and return for another forty minutes. Each song will last for a few minutes and there is dead time between songs. Due to the duration of the concert sound from the theater it appears that the use of one hour reference time for averaging sound levels is inappropriate.
> \*\*\*
> The Board believes that due to the pattern of noise emission from the theater, the use of a shorter averaging period is appropriate. Based on the information in the record relating to duration of songs and intermissions during concerts, the Board believes that an averaging period of 5 minutes is reasonable to obtain meaningful sound data."

The Board reached its conclusion based upon the testimony of Dr. Fleicher, an acoustics expert presented by Matteson, and the Theater's exhibit 10, a report by Electro-Acoustic Systems, Inc., and Yerges Acoustics of Downers Grove. The experts for both sides agreed that the Leq was a very useful environmental metric, but that the one-hour measurement period "proved unrealistically long for the conditions encountered at these measurement sites."

Now on appeal the Theater argues that the Board is without authority to impose a five-minute Leq reference time, because it is a stricter standard than the one-hour Leq reference time required by section 900.103 of the Code. On this basis the Theater urges this court to find the Board's order invalid.

Although the Board's order makes reference to the general regulations on sound emissions for property line noise sources, as set

forth in section 901.101 *et seq.* of the Code (35 Ill. Adm. Code, ch. I, § 901.101 *et seq.* (1994)), it is important to remember that the Board was not utilizing these regulations to determine a violation. A violation had already been established using the "unreasonably interfered with enjoyment of life and lawful activity" narrative standard.

Strict adherence to sections 901.102 and 900.103 is only necessary when proving a violation of the Board's numeric standards. By its own terms, section 900.103(b), which requires the one-hour Leq reference time, is "applicable only" to the numeric standards of section 901 of the Code. Thus, the one-hour Leq reference time does not apply to violations of section 24 of the Act.

Illinois decisions reflect the generally acknowledged authority of the Board to take whatever steps are necessary to rectify the problem of pollution and to correct instances of pollution on a case-by-case basis. In *W.F. Hall Printing Co. v. Environmental Protection Agency* (1973), 16 Ill. App. 3d 864, 868, 306 N.E.2d 595, the court held that the Board is endowed with the discretion to "promulgate regulations or to develop standards in the course of case-by-case enforcement proceedings." That is, the Board is not required, nor would it be feasible, to adopt regulations for all types or sources of pollution. *W.F. Hall Printing Co.*, 16 Ill. App. 3d at 869; see also *Mystic Tape, Div. of Borden, Inc. v. Pollution Control Board* (1973), 16 Ill. App. 3d 778, 306 N.E.2d 574.

Although *W.F. Hall* and *Mystic* both dealt with odor pollution and were decided before any regulations had been adopted by the Board with respect to their particular form of odor pollution, the grants of authority set forth in these cases apply here.

In this case, the Theater falls within the general category of "property line noise source," but emits sound of a different type than other noise sources. Having already found that the Theater was in violation of the Act, it was appropriate for the Board to place reasonable restrictions on the Theater to correct the situation.

The Board ordered the Theater to monitor its sound emissions and stay within sound emission limitations already adopted by the Board. The only difference was that it adapted the measuring procedures to the particular circumstances present.

The Board's action was not arbitrary or capricious since it was based upon expert evidence provided by both parties. We uphold the Board's remedy.

## 2. BEYOND THE SCOPE OF POWERS

The Theater contends that the remedy fashioned by the Board violates the Act because it goes beyond the scope of the Board's powers. We do not agree.

In *Kaeding v. Pollution Control Board* (1974), 22 Ill. App. 3d 36, 38, 316 N.E.2d 788, the court stated, "[T]he legislature has conferred upon the *** Board those powers that are reasonably necessary to accomplish the legislative purpose of the administrative agency; specifically the imposition of monetary 'penalties' for violation of the *** Act, and necessarily the power to order compliance with the Act." The Board's final order is an exercise of the Board's power to order compliance.

### 3. IMPROPER RULEMAKING

■ The Theater also argues that the monitoring requirements imposed by the Board in this case constitute improper rulemaking.

The Illinois Administrative Procedure Act defines "rule" as an "agency statement of general applicability that implements, applies, interprets, or prescribes law or policy." (5 ILCS 100/1—70 (West 1992).) In *Granite City Division of National Steel Co. v. Illinois Pollution Control Board* (1993), 155 Ill. 2d 149, 613 N.E.2d 719, our supreme court explained the difference between a "rule," which is an environmental standard of general applicability, and a "criterion," which is a numeric limitation specific to a particular pollution discharger.

The five-minute Leq averaging procedure prescribed by the Board in this case was not intended to be an amendment to the general rules and regulations. It was not a new standard of general applicability and, thus, was not "rulemaking" as that term is defined in the Act.

### 4. VIOLATION OF RIGHTS TO EQUAL PROTECTION AND FREEDOM OF SPEECH

■ The Theater argues that the Board, by applying a stricter standard to its noise emissions, has violated its right to equal protection of the law. The Theater also contends that the Board has singled it out as a special class for restrictions on speech.

As we have said, the standard used to determine whether the Theater violated the Act was the general "unreasonable interference" standard applicable to all noise sources. No stricter standard was applied to the Theater. No equal protection rights were violated.

Though music is a protected form of expression, it is well settled that reasonable content-neutral time, place, or manner regulations are acceptable as long as they are designed to serve a substantial governmental interest. (*City of Renton v. Playtime Theatres, Inc.* (1986), 475 U.S. 41, 89 L. Ed. 2d 29, 106 S. Ct. 925; *Clark v. Community For Creative Non-Violence* (1984), 468 U.S. 288, 82 L. Ed. 2d

221, 104 S. Ct. 3065.) There is a keen governmental interest in protecting the tranquility and privacy of the home from unwelcome noise. (See *Ward v. Rock Against Racism* (1989), 491 U.S. 781, 105 L. Ed. 2d 661, 109 S. Ct. 2746.) In this case the content-neutral volume restrictions imposed by the Board pass constitutional muster.

CONCLUSION

For the reasons stated above, the Board's final order is affirmed.

Affirmed.

CAMPBELL, P.J., and BRADEN, J., concur.