(No. 47682.–

PROCESSING AND BOOKS, INC., *et al.*, Appellees, v. THE POLLUTION CONTROL BOARD *et al.*, Appellants.

*Opinion filed June 28, 1976.*

William J. Scott, Attorney General, of Springfield (Russell R. Eggert, Fredric J. Entin, and Jeffrey S. Herden, Assistant Attorneys General, of Chicago, of counsel), for appellants.

Lewis D. Clarke and Clayton P. Voegtle, of Waukegan (Snyder, Clarke, Dalziel, Holmquist & Johnson, of counsel), for appellees.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

A complaint filed by the Illinois Environmental Protection Agency with the Illinois Pollution Control Board on April 7, 1972, charged that the respondents, Processing and Books, Inc., an Illinois corporation, and National Mellody Farm Fresh Egg Company, its wholly owned subsidiary, had caused air pollution consisting of odors from chicken manure and incinerators used to dispose of dead chickens, in violation of section 9(a) of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1009(a)). The Board fined the respondents $3,000 and entered a cease and desist order.

The respondents appealed, raising issues concerning

the adequacy of the record to support the Board's findings, the specificity of those findings, the burden of introducing evidence, and the propriety of the relief ordered. The appellate court reversed on the ground that the Board's order does not specifically indicate that it took into consideration four factors set out in the Act as bearing on the reasonableness of the pollution. The court declined to remand, apparently not because the record is devoid of evidence to support the order, but because the evidence that supports the order was not introduced by the Agency. (28 Ill. App. 3d 115 (2d Dist. 1975).) We granted leave to appeal.

The offense charged is set out in section 9(a) of the Environmental Protection Act:

"No person shall:

(a) Cause or threaten or allow the discharge or emission of any contaminant into the environment in any State so as to cause or tend to cause air pollution in Illinois, either alone or in combination with contaminants from other sources, or so as to violate regulations or standards adopted by the Board under this Act." Ill. Rev. Stat. 1971, ch. 111½, par. 1009(a).

"Air pollution" is defined in section 3(b) as

"the presence in the atmosphere of one or more contaminants in sufficient quantities and of such characteristics and duration as to be injurious to human, plant, or animal life, to health, or to property, or to unreasonably interfere with the enjoyment of life or property." Ill. Rev. Stat. 1971, ch. 111½, par. 1003(b).

Section 33 provides:

"(a) After due consideration of the written and oral statements, the testimony and arguments that shall be submitted at the hearing, or upon default in appearance of the respondent on return day specified in the notice, the Board shall issue and enter such final order, or make such final determination, as it shall deem appropriate under the circumstances. In all such matters the Board shall file and publish a written opinion stating the facts and reasons leading to its decision. The Board shall immediately notify the respondent of such order in writing by registered mail.

* * *

(c) In making its orders and determinations, the Board shall take into consideration all the facts and circumstances bearing upon the reasonableness of the emissions, discharges or deposits involved including, but not limited to:

(i) the character and degree of injury to, or interference with the protection of the health, general welfare and physical property of the people;

(ii) the social and economic value of the pollution source;

(iii) the suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved; and

(iv) the technical practicability and economic reasonableness of reducing or eliminating the emissions, discharges or deposits resulting from such pollution source." Ill. Rev. Stat. 1971, ch. 111½, par. 1033.

Before we consider the formal deficiencies which the appellate court found in the Board's order, it is necessary to review the stipulated facts as well as the evidence received during the five public hearings, as reflected in the order of the Board.

The property involved is a portion of the large Hawthorne-Mellody farm, which is owned by Processing and Books, Inc., and leased to National Mellody Farm Fresh Egg Company, which conducts an egg-producing operation. This operation is located southeast of the village of Mundelein and south of the village of Libertyville in an area zoned for agricultural uses. In 1965, the cattle and dairy operations to which the farm had been primarily devoted were terminated, and since that time the poultry operation has been greatly expanded. Before a new building program was undertaken in 1965, the chicken population was between 15,000 and 18,000. In 1965 the two existing chicken houses were "phased out," and two new ones were built. Two more new houses were built in 1966, and 12 more were started in 1969 and completed in 1970. Each new house has a capacity of more than 21,350

chickens. The total chicken population ranges between 296,000 and 330,000, and the farm produces between 160,000 and 170,000 grade "AA" eggs per day, 95 percent of which are sold to the National Tea Company.

The Board found that "[s]ome of Respondent's neighbors had lived in the area for almost 20 years. Some of them had their own farm animals and therefore had to dispose of manure. Although they tolerated the past odors emanating from a much smaller operation they found they could no longer enjoy their homes and property because of the chicken manure odor and the even more permeating odor of burning chickens and feathers."

The Agency has not disputed that the operation has substantial social and economic value. Initially it had contended that the operation was commercial rather than agricultural, but the Board found against the Agency on that issue and the finding is not challenged. The Board's order summarizes the evidence that showed that the odors emanating from the egg farm had interfered with the public's enjoyment of life and property in an area extending more than a mile beyond the boundaries of the farm. Expert and lay testimony was presented as to the sources of the odors: chicken manure spread on the farm's fields; holding tanks in each of 16 chicken houses where the manure, which accumulates at the rate of 75,000 pounds per day, was allowed to remain for three or four weeks before being taken away; a dryer used to convert some of the manure into marketable fertilizer; and two incinerators used to burn about 175 chickens which die every day. There was extensive evidence that residents of the area were prevented from holding cook-outs and relaxing out of doors, became nauseated while driving past the farm, and occasionally were even awakened at night by what one witness termed "a foul odor."

Complaints had been brought to the respondents' attention by private citizens, the county health department and the sheriff's office, but the odors persisted. The

evidence showed that the odors might be substantially diminished if the manure in the holding tanks was disposed of within a week of its expulsion from the chickens since it takes approximately that long for bacterial decay to produce hydrogen sulfide, sulfur dioxide and other obnoxious gases. There was also evidence that incinerators of multichamber design would produce less air pollution than the single-chamber incinerators used by the farm.

The Board's order found from the testimony of the manager of the operation that, contrary to established procedure, employees sometimes put dead chickens in the incinerator and then started the burners. The order also pointed out that after the Agency's complaint had been filed, the respondents had installed a stack which provided "increased retention time for burning of gases at a high temperature [which] should reduce odor potential. That installation," the Board's order continued, "along with improved operator procedure, should result in substantial nuisance abatement." As the appellate court's opinion recognized, the respondents had presented evidence as to the financial investment in the operation, and the financial feasibility of installing other forms of drying systems than those it employed. 28 Ill. App. 3d 115, 116.

One of the grounds upon which the appellate court reversed the Board's order appears to have been the fact that it does not contain specific findings on each of the four factors which section 33(c) directs the Board to consider. This aspect of the court's opinion is based upon the observation of this court in *Incinerator, Inc. v. Pollution Control Board* (1974), 59 Ill.2d 290, 299:

"We are inclined to agree with appellant that the Board was not as specific as it might have been in making written findings as to each of the section 33(c) criteria. However, there was substantial compliance with the Act, and in view of all the evidence and the fact that the Board appears to have properly determined the issue of

> reasonableness in light of the section 33(c) factors, we do not deem it necessary to remand the cause for further findings. We would expect that decisions of the Board rendered after the date of this opinion will be more specific in this regard."

The Board's order in the case before us was entered prior to our decision in *Incinerator,* and the suggestions there advanced as to the desirable form of orders are not applicable to this case. Our review of the record compiled during the public hearings satisfies us that the evidence introduced by the Agency and by the respondents supplied the Board with sufficient evidence to support its ruling on each of the section 33(c) factors, and that it is clear from the Board's order that it considered each of those factors.

The other ground upon which the appellate court reversed the order of the Board is that the Agency did not itself introduce evidence upon each of the criteria mentioned in section 33(c) of the Act, and that "[b] y failing to introduce evidence on each criteria of [section] 33(c), the Agency failed to meet its burden of proof." (28 Ill. App. 3d 115, 118.) The same view with respect to the burden of introducing evidence was subsequently expressed by the same court in *Aurora Metal Co. v. Pollution Control Board* (1975), 30 Ill. App. 3d 956, and had been stated earlier by the Third District Appellate Court in *Lonza, Inc. v. Pollution Control Board* (1974), 21 Ill. App. 3d 468. Other appellate courts had taken a contrary position. See *Freeman Coal Mining Corp. v. Pollution Control Board* (5th Dist. 1974), 21 Ill. App. 3d 157, and *Ford v. Environmental Protection Agency* (3d Dist. 1973), 9 Ill. App. 3d 711.

The view expressed by the appellate court in this case is not in accord with section 31(c) of the Act, which specifically governs the burden of proof in hearings before the Board. It provides:

> "In hearings before the Board under this Title the

burden shall be on the Agency or other complainant to show either that the respondent has caused or threatened to cause air or water pollution or that the respondent has violated or threatens to violate any provision of this Act or any rule or regulation of the Board or permit or term or condition thereof. If such proof has been made, the burden shall be on the respondent to show that compliance with the Board's regulations would impose an arbitrary or unreasonable hardship." (Ill. Rev. Stat. 1973, ch. 111½, par. 1031(c).)

Standing alone, this provision is entirely clear. If there is doubt as to who must prove what, it must ·come from some other source. The appellate court apparently concluded that this court's opinion in the *Incinerator* case had placed upon the Agency the burden of proving, by evidence which it offered, the unreasonableness of the respondents' conduct in terms of each of the four criteria mentioned in section 33(c). No such result was intended by our decision in *Incinerator.*

In that case we noted that a complainant bears the burden of persuasion on the essential elements of the offense charged. (59 Ill.2d 290, 300.) The offense charged in *Incinerator* and in this case is one of the two types of air pollution defined by section 3(b): that which "unreasonably interferes with the enjoyment of life or property." (59 Ill.2d 290, 295; *Mystik Tape v. Pollution Control Board* (1975), 60 Ill.2d 330, 335.) The problem stems from the use of the word "unreasonably." Each of the four criteria mentioned in section 33(c) bears upon the reasonableness of the conduct involved, and so it might be argued that, in order to establish the type of section 3(b) offense that is here involved, the complainant bears the burden of proof with respect to each of those criteria. But this interpretation of the word "unreasonably" as used in section 3(b) would appear to place upon the complainant a burden more stringent than he would bear in a common law nuisance action, and thus to frustrate the purpose of

the Act "to establish a unified, state-wide program supplemented by private remedies, to restore, protect and enhance the quality of the environment, and to assure that adverse effects upon the environment are fully considered and borne by those who cause them." (Ill. Rev. Stat. 1973, ch. 111½, par. 1002(b).) It would also render redundant or contradict the allocation of the burdens of proof in section 31(c). See Currie, *Enforcement Under the Illinois Pollution Law,* 70 Nw. U.L. Rev. 389, 460-63 (1975).

There is little that any person can do which does not in some degree "interfere with the enjoyment of life or property" of other persons. The very act of breathing consumes oxygen. In our opinion the word "unreasonably" as used in section 3(b) was intended to introduce into the statute something of the objective quality of the common law, and thereby exclude the trifling inconvenience, petty annoyance or minor discomfort. (See, *e.g., Gardner v. International Shoe Co.* (1944), 386 Ill. 418, 429.) The word is used in a similar sense in the disorderly conduct statute (Ill. Rev. Stat. 1967, ch. 38, par. 26–1(a)). "As used in this statute it removes the possibility that a defendant's conduct may be measured by its effect upon those who are inordinately timorous or belligerent." (*People v. Raby* (1968), 40 Ill.2d 392, 395.) This is the meaning that was given to the word "unreasonably" in the *Incinerator* case when the court referred to "a substantial interference with the enjoyment of life and property." *Incinerator, Inc. v. Pollution Control Board* (1974), 59 Ill.2d 290, 297.

The penalty of $3,000 was imposed after hearings which revealed that the respondents seriously interfered with the enjoyment of life and property in ways that could reasonably have been prevented. The Board did not abuse its discretion in fixing that fine. The cease and desist order is not vague. Even though it was issued some time after the entry of the initial order finding a violation and imposing

the penalty, it clearly incorporates by reference the initial order, which describes the violations of section 9(a) to which it refers.

In our opinion the determination of the Board was correct, and the judgment of the appellate court is reversed.

*Judgment reversed.*