THE VILLAGE OF WESTERN SPRINGS, Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

First District (2nd Division)    No. 81-1117

Opinion filed March 30, 1982.—Supplemental opinion filed on denial of rehearing August 10, 1982.

Lord, Bissell & Brook, of Chicago (Robert A. Knuti and Andrea Sykes Foote, of counsel), for petitioner.

No appearance for respondent John F. Burns.

JUSTICE HARTMAN delivered the opinion of the court:

Petitioner, Village of Western Springs (Village) seeks administrative review (Ill. Rev. Stat. 1979, ch. 111½, par. 1041; Ill. Rev. Stat. 1979, ch. 110, par. 264 *et seq.*) of a decision rendered by the Illinois Pollution Control Board (Board) ordering it to cease and desist from violating section 12(a) of the Environmental Protection Act (Act) (Ill. Rev. Stat. 1979, ch. 111½, par. 1012(a)) and to submit a compliance plan to eliminate surcharge of human wastes into ponded street surface waters. The Board's decision arose out of a complaint filed by a village resident, John Burns, charging that his property was flooded periodically by storm water and sewage through village violations of several regulations of the Board and sections of the Act, including section 12(a). The issues raised on appeal are whether the Board's determination was supported by the manifest weight of the evidence, and appropriate relief was ordered. For the reasons set forth below, we affirm.

Respondent Board has filed the transcript of hearings, together with exhibits in accordance with section 7 of the Administrative Review Act; however, John Burns has not filed an appearance in this review. Ill. Rev. Stat. 1979, ch. 110, par. 270.

Evidence adduced at the administrative hearing on October 21, 1980, revealed that after a bad storm in August 1972, the basement of John Burns' house, located at 4419 Clausen, flooded with water, human waste and toilet paper. This mishap was caused by the backup of a toilet in his basement. In September 1973, his basement again filled up with similar debris, after which he removed his basement toilet. During a heavy rain in April 1974, he observed paper coming up from the manhole, located 30 feet from his front porch. On June 12, 1976, his property was again flooded and he observed water, although no human waste, coming up through the same manhole. About one dozen other flooding incidents, up to and including August 1980, were described. Generally, after a storm would abate, the water would remain on Burns' property and in the street from 2 to 4 hours. The water ranged in depth from 12″ to 18″.

Expert engineering testimony revealed that a combined sewer passing by Burns' property eventually intersects the interceptor sewer of the Metropolitan Sanitary District of Greater Chicago (District). Combined sewers are designed to handle a combination of sanitary flows and storm flows. The interceptor sewer, designed to handle only sanitary flow, is about 24″ in diameter; the combined sewer line servicing Burns' property is 48″ in diameter. The interceptor sewer can receive all the flow from the combined sewer during times when there is no storm water runoff. When there is storm water runoff, the large flows that come through the combined sewer are diverted into Salt Creek. Combined sewer overflow is the excess, untreated water and sewage which discharges into Salt Creek, because it cannot be accepted by the interceptor sewer. The sewer pipe could also be filled up to a degree that would cause a backup into a house. The dry weather flow of a combined sewer is commonly less than 5% or 10% of the capacity of the sewer, so that once the sewer starts to flow full, it is diluted 10 to 20 times by storm water.

The problem of the combined sewer overflow has been addressed by the Tunnel & Reservoir Plan (TARP), which has been approved by the Illinois Environmental Protection Agency and the District. The essence of the plan is that instead of the overflows being discharged into Salt Creek, they would be discharged into a proposed "deep tunnel." The engineer recommended that the Village connect its combined sewers to the proposed tunnel as soon as it is available, which would solve the pollution control problem.

The expert found no economic justification to construct new storm sewers for the Village solely for the purpose of diminishing the frequency

and depth of "ponding." On October 21, 1980, the cost of a sewer system of maximum size in hooking up to TARP would be over one million dollars. The construction would reduce but not eliminate the numbers and depths of pondings. Ponding is considered a legitimate device for storing storm water runoff. Ponding may also consist of both sewer and storm water. Fifty-five households in the Village are affected by ponding. Burns could "flood proof" his home by surrounding it with an earth berm, building a concrete wall in other areas, and providing some sort of source of emergency power to insure the operational use of his sump pumps. As of February 1979, this would cost about $10,000. The pumps at the 55th Street Pumping Station, should they be operated, would aggravate the flooding problem affecting Burns. Although there seems to be "some question" as to whether they are actually operated, the Village has petitioned the District to remove the pumps.

A flood control policy resolution adopted by the Village was attached as Exhibit A to Burns' complaint. The Village resolved that it would not expend large sums of money for the construction of new sewer systems, that temporary ponding was an integral part of the present water management system, that such damages were most economically mitigated by the private actions of the owners of the properties, and that specific, localized improvements financed by special assessments at no cost to the Village be made to alleviate specific flooding conditions.

The Board's decision, in part, found that the discharge of the combined sewer flow from street manholes into the ponded street surface waters violated section 12(a)'s prohibition against water pollution. The Village was ordered to cease and desist violating that section within a specified date and was required to submit a compliance plan acceptable to the Environmental Protection Agency within 90 days of the date of the order.

I

The Village contends that Burns failed to show a violation of section 12(a) (Ill. Rev. Stat. 1979, ch. 111½, par. 1012(a)) and that the finding of a violation is contrary to the manifest weight of the evidence. We disagree. ■■ Section 12(a) prohibits any person from causing or tending to cause water pollution. In turn, "water pollution" is defined as the discharge of any contaminant into Illinois waters "as will or is likely to create a nuisance or render such waters harmful * * * to public health, safety or welfare * * *." (Ill. Rev. Stat. 1979, ch. 111½, par. 1003(hh).) The Board could have reasonably found a violation of section 12(a) from evidence showing that during a heavy rainstorm there is a substantial risk of the Village's combined sewer becoming full and discharging "sewer water" composed of sanitary wastes and storm water onto the surface street

areas. Such evidence supports a finding of a substantial risk of actual pollution, thereby establishing a prima facie statutory violation. Ill. Rev. Stat. 1979, ch. 111½, par. 1041; Ill. Rev. Stat. 1979, ch. 110, par. 274.

## II

The Village urges that even if a "technical" statutory violation was proved, the relief granted by the Board was not necessary for a variety of reasons, including the ongoing relationship between the Illinois Environmental Protection Agency (Agency) and the Village concerning its sanitary and storm sewer system. This latter argument is untenable. The instant complaint was initiated by a private citizen pursuant to section 31(b) of the Act (Ill. Rev. Stat. 1979, ch. 111½, par. 1031(b)), which specifically authorizes such an action as a safeguard against inadequate prosecution. (See, *e.g.*, Currie, Enforcement Under the Illinois Pollution Law, 70 Nw.U.L. Rev. 389, 452-54 (1975).) The Village's previous dealings with the Agency were apparently insufficient or ineffective, precisely the *raison d'etre* of section 31(b). In effect, the Board has determined that more efficacious efforts to solve the sanitary waste discharge must be made by the Village in cooperation with the Agency. The Village insists that the problem will someday be alleviated when the District's "deep tunnel" TARP project is built. It appears that the Board by its directive to the Village to "* * * work with the Agency to determine and implement changes in its sewer system to eliminate the surcharge of human wastes into ponded street surface waters," is unwilling to abide the uncertainty of whether and when TARP will be completed and become accessible.

Once the evidence adduced at the administrative hearing established a prima facie water pollution violation, the burden shifted to the Village, under section 31(c) (Ill. Rev. Stat. 1979, ch. 111½, par. 1031(c)) to introduce evidence demonstrating that compliance would be unreasonable in light of the section 33(c) criteria (Ill. Rev. Stat. 1979, ch. 111½, par. 1033(c)) and any other pertinent, mitigating factors. (*Processing & Books, Inc. v. Pollution Control Board* (1976), 64 Ill. 2d 68, 75-77, 351 N.E.2d 865; *Slager v. Pollution Control Board* (1981), 96 Ill. App. 3d 332, 338, 421 N.E.2d 929; Currie, at 460-63.) In coming to its determination under section 33(c) the Board was obligated to consider facts and circumstances bearing upon the reasonableness of the discharges including, among other things, the character and degree of injury to the health, general welfare and physical property of the people; the social and economic value of the pollution source; and the technical practicability and economic reasonableness of reducing or eliminating the discharges.

The record shows that although danger of public injury was diminished by the dilution of sewage by the storm water flow, as the Board observed in its opinion, there remains a danger to persons wading in the

water and to children playing amid sewage materials. Clearly, more than mere inconvenience of one homeowner is involved here. There was evidence which implied that it may not be "technically practicable" to abate the pollution. The engineering expert concluded that the construction of new storm sewers of the maximum size for hooking up to TARP was not economically justifiable. Such construction would cost the Village, having a population of some 12,830 people, over one million dollars and then only slightly reduce the flooding problem. By its order, however, the Board did not direct the construction of new storm sewers nor did it demand an unreasonable solution to the problem. One of the possible methods available for the diminution of sewage backup alluded to by the Board was reference to cooperation with the District with respect to the operation of its 55th Street Pumping Station, which the record appears to demonstrate exacerbates the problem. Another possibility appears in section 46(a) of the Act (Ill. Rev. Stat. 1979, ch. 111½, par. 1046(a)), which authorizes municipal corporations that have been directed to abate violations of the Act to secure financial assistance through issuance of general obligation bonds, revenue bonds, or Federal funding. See *North Shore Sanitary District v. Pollution Control Board* (1973), 55 Ill. 2d 101, 302 N.E.2d 50.

■■ Since the Village has not as yet attempted to ameliorate the problem in cooperation with the Environmental Protection Agency, pursuant to the Board's order instanter, the Board's decision cannot at this time be deemed economically unfeasible and in excess of the scope of its authority.

For the foregoing reasons, the decision of the Pollution Control Board is not against the manifest weight of the evidence nor does its order exceed the powers delegated to it by the Act. Accordingly, the decision must be affirmed.

Affirmed.

DOWNING and PERLIN, JJ., concur.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

JUSTICE HARTMAN delivered the opinion of the court:

In a post-opinion motion, the Village moved pursuant to Supreme Court Rule 329 (73 Ill. 2d R. 329) for an order granting leave to supplement the record with an affidavit of the village manager, Paul Nicholson, supported by several letters attached as exhibits A, B and C thereto, dated March 28, 1980, April 1, 1982, and December 22, 1980, respectively. Nicholson's affidavit stated that after the hearing before the Board he

was told in a telephone conversation in the fall of 1980 by the general superintendent for the District that there was no longer any diversion of water from the 55th Street Pumping Station into the combined sewers that pass in front of the complainant's residence; that he has personally investigated the matter; that the pumping station has had no effect whatsoever on the ponding condition that has existed in front of the complainant's residence since at least the fall of 1980; that on April 7, 1982, he was informed in a telephone conversation with the project manager of the Grant Administration Section, Illinois Environmental Protection Agency (Agency) that no relief sewer work of any type which could be constructed to directly mitigate the ponding problem at the complainant's residence would be grant eligible.

■■ Since section 3—110 of the Administrative Review Law (Ill. Rev. Stat. 1981, ch. 110, par. 3—110) expressly provides that "* * * [n]o new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court," the Village cannot be allowed to supplement the record. The Village's motion to supplement the record accordingly is denied.

■■ The new evidence, however, is relevant and material to the technical practicality of abating the discharge of sewer water onto surface street areas (see Ill. Rev. Stat. 1979, ch. 111½, par. 1033(c)), and the only solution alluded to in the Board's opinion, that pertaining to the 55th Street Pumping Station. In light of this new development and the evidence showing that it may not be technically feasible to abate the pollution discharge, we remand the cause under section 3—111(a)(7) of the Administrative Review Law (Ill. Rev. Stat. 1981, ch. 110, par. 3—111(a)(7)) for further hearings on evidence discovered by the Village subsequent to October 21, 1980, the date of the final hearing, respecting the economic feasibility of the pollution abatement, with the Village bearing the burden of persuasion at such proceedings. Ill. Rev. Stat. 1979, ch. 111½, par. 1031(c).

Affirmance vacated and cause remanded for further hearings.

DOWNING and PERLIN, JJ., concur.