ANTHONY ROTI *et al.*, Petitioners-Appellees, v. LTD COMMODITIES, Respondent-Appellant (The Pollution Control Board, Appellee).

Second District    No. 2—04—0199

Opinion filed February 9, 2005.

Lisa Madigan, Attorney General, of Chicago (Gary S. Feinerman, Solicitor General, and Nadine J. Wichern, Assistant Attorney General, of counsel), for Pollution Control Board.

Joseph E. Kolar, of Baizer & Kolar, P.C., of Highland Park, for respondent.

JUSTICE GILLERAN JOHNSON delivered the opinion of the court:

The petitioners, Anthony Roti, Karen Roti, Paul Rosenstrock, and Leslie Weber, filed a complaint with the Illinois Pollution Control Board (the Board), alleging that the respondent, LTD Commodities, had committed various acts of noise pollution. Following a hearing, the Board determined that LTD had violated the noise nuisance provisions of section 24 of the Illinois Environmental Protection Act (the

Act) (415 ILCS 5/24 (West 2002)) and section 900.102 of the Board's administrative regulations (the Regulations) (35 Ill. Adm. Code § 900.102 (2002)). The Board fined LTD $15,000 and ordered it to shut down nighttime operations and disconnect the back-up beeper on its yard tractor. The Board ordered that as an alternative to shutting down nighttime operations and disconnecting its back-up beeper, LTD could construct a noise wall. LTD appeals from the February 15, 2001, July 24, 2003, and February 5, 2004, orders of the Board finding it a noise nuisance and ordering the above-described remedies. We affirm.

## I. BACKGROUND

### A. The Parties and Their Dispute

LTD is a mail order catalog company that sells household items, toys, and clothing. LTD's corporate headquarters and warehouse are located at 2800 North Lakeside Drive, in Bannockburn, Illinois. LTD commenced operations in Bannockburn in 1986. The petitioners are homeowners who reside on Wedgewood Drive in Lake Forest, Illinois. The petitioners moved into their homes between 1988 and 1992. LTD and the petitioners share a common property line that is also the boundary line between Bannockburn and Lake Forest.

In the fall of 1996, the noise generated by LTD's warehouse operations began to disturb the petitioners. On July 22, 1998, the petitioners filed a complaint with the Board, alleging that LTD was violating the numeric noise restrictions set forth in the Act and the Regulations. The petitioners additionally alleged that LTD was a noise nuisance. Between November 1, 1999, and May 24, 2000, the Board conducted a hearing. The following evidence was introduced at the hearing.

### B. The Administrative Hearing

#### 1. *LTD's Warehouse Operations*

LTD is a privately owned catalog company that sells only to business customers. LTD does not manufacture any of its products. LTD buys products from various manufacturers. Products are shipped to LTD by truck. The products are received at the truck docks located at the north side of LTD's warehouse. Products are unloaded by LTD employees and then stored in the warehouse until they are repackaged and shipped to customers.

LTD purchased its Bannockburn facility in 1986. At that time, the warehouse was 100,000 square feet and equipped with eight truck docks. In 1989, LTD purchased adjacent land and expanded its warehouse to 200,000 square feet and 26 truck docks. In 1995, LTD expanded its warehouse to 400,000 square feet.

During its busy season, which is August through December, LTD employs 1,200 to 1,300 people. LTD runs a first shift from 5:30 or 6 a.m. until 2 or 3 p.m. LTD runs a second shift from 3:30 p.m. until 12:30 a.m., at times extending to between 1:30 and 3 a.m. LTD operates Mondays through Fridays all year and on Saturdays during the Christmas season. According to Michael Hara, LTD's chief operating officer, if LTD were prohibited from running a second shift, "it would destroy the business."

The trucks delivering products to and shipping products from the warehouse are not owned by LTD. The drivers of the trucks are not LTD employees. When trucks arrive at LTD, they enter the lot from Lakeside Drive and proceed to the staging area at the north end of the warehouse. To avoid backups, LTD schedules trucks to arrive at half-hour intervals. When trucks arrive early, they stand idling on Lakeside Drive or in the north end of the parking lot. While idling, the truck drivers sometimes shout or honk their horns.

The staging and truck dock areas are 8 to 12 feet below grade. Trucks entering and exiting these areas must drive up and down a ramp. After trucks drive down the ramp, they typically release the air from their air brakes. The release of the air creates an abrupt hissing sound. The hissing sound is classified as an "impulse noise." An impulse noise is a noise that becomes loud quickly and fades quicky. It can be heard over other significant background noise. When driving up the ramp, trucks must accelerate, which also creates an impulse noise.

When down in the staging and truck dock area, trucks disconnect from their trailers, using a vehicle known as a "yard tractor." The yard tractor backs up against the trailer, connects to it, and moves the trailer to a dock to be loaded or unloaded. After a trailer is loaded or unloaded, it is removed from the dock, backed up to a retaining wall at the north end of the staging area, and eventually reconnected with its truck. The yard tractor emits several impulse noises.

The connecting and disconnecting of the trailers creates a metal-on-metal booming sound. As the yard tractor moves the trailers, the trailer doors typically bang around because they are unhitched. Sometimes when the yard tractor places a trailer at the retaining wall, the trailer hits the rubber bumpers. This creates an abrupt noise and makes the ground vibrate. The yard tractor itself has a loud motor and also a back-up warning beeper that sounds every time the tractor is driven in reverse.

In the fall of 1996, Hara became aware that residential neighbors of LTD were complaining regarding noise. Hara testified that LTD took several steps to alleviate the noise. LTD talked to the truck driv-

ers about shouting and honking their horns. LTD implemented a policy that prohibited trucks from idling on the north end of the parking lot, which is the same grade level as the neighboring residences. LTD hired a guard to ensure enforcement of its policy. LTD acquired a yard tractor with a quieter engine. LTD did not disconnect the back-up warning beeper on the yard tractor due to liability concerns. LTD considered building a noise wall, but decided against it because such a wall would be expensive.

## 2. *The Petitioners' Concerns*

Petitioner Paul Rosenstrock purchased his property on Wedgewood Drive in 1987. He paid approximately $450,000 for the land and the house he built upon the land. He and his daughter, who was nine years old at the time of the hearing, moved into the Wedgewood residence in 1988. Rosenstrock was aware of the nearby commercial property when he purchased his property. While the house was being built, he requested that the builder add extra insulation for noise abatement.

LTD's trucking operation did not disturb Rosenstrock until some time after 1994, when LTD expanded the warehouse and added more trucking docks. Currently, from inside his home, Rosenstrock can hear truck air brakes releasing, trailer doors banging, horns honking, the connecting and disconnecting of the yard tractor, the yard tractor's engine, and the yard tractor's back-up warning beeper. Rosenstrock can hear the noise even with his windows shut. Rosenstrock sometimes feels vibrations in his home when the yard tractor backs up a trailer against the retaining wall. One time, a light fixture fell from his ceiling due to the vibrations.

The noise from LTD is frequent and disturbs Rosenstrock's ability to fall asleep. The noise often awakens him at night. The noise has at times woken his daughter from a sound sleep and frightened her. Rosenstrock testified that the noise is "tremendously annoying, very disruptive of my life and my house." Rosenstrock recorded numerous dates and times he and his daughter were disturbed late at night or early in the morning by the noise.

Petitioners Anthony and Karen Roti purchased and moved into their home on Wedgewood Drive in August 1990. The Rotis paid $525,000 for the home. The Rotis were aware of the proximity of LTD. They did not consider at the time they purchased the home that the noise generated by LTD would be problematic. The Rotis resided in the home with their five children, ages 5 through 16 at the time of the hearing.

In 1996, the Rotis began hearing noise from LTD's dock area. Ac-

cording to Karen Roti, the noise "went on all day and night," Monday morning through Saturday afternoon. The noise sounded like "loud bangs" and "nonstop beeping." They could hear the noise even with their windows closed. Sometimes, the Rotis would feel vibrations in their home.

The noise was so loud that the Rotis and their children could not fall asleep or stay asleep. The noise caused Anthony Roti to be irritable. Anthony found it difficult to work from home on his computer. The noise caused Karen Roti to be tired, tense, and crabby. In order to fall asleep over the noise, Karen Roti often took Tylenol with codeine or Benadryl or had a couple of beers. The Roti children found it difficult to study.

Petitioner Leslie Weber purchased her property on Wedgewood in 1988. She bought the lot for $223,000 and then spent $453,000 to build a home on the lot. Before purchasing the lot, Weber discussed with her husband the impact that the noise from LTD and the nearby tollway might have on the resale value of the property. Weber and her husband decided to purchase the property despite the possible effect of noise, because the lot was large and wooded. Weber resided in the home with her husband and two sons, who at the time of the hearing were 9 and 16 years old.

Weber was first disturbed by noise from LTD in 1996. The noise sounded like a "loud diesel engine." Additionally, she heard "loud booming" and "crashing" noises. The noise came from the vicinity of LTD. The noise could be heard through closed windows. The noise hindered Weber and her family from spending time in the backyard or on the patio. Weber's husband found it difficult to read. The noise impaired Weber's and her family's ability to fall asleep at night. Weber would frequently be awakened by noise at early hours in the morning such as 2 a.m. The noise caused Weber to be irritable and grouchy.

### 3. Other Noise in the Area

The East-West Tollway is situated approximately 1,000 feet west of the petitioners' homes. Additionally, there is a tollway ramp near the southwest end of LTD. The petitioners can hear traffic noise from the tollway and tollway ramp. The petitioners can distinguish the noise from the tollway and the noise from LTD. The noise from the tollway and tollway ramp does not disturb the petitioners. According to acoustical consultant Thomas Thunder, the tollway noise in the area is dominant. However, tollway noise is a constant, white noise known as a broadband noise. The human ear can become accustomed to broadband noise over time.

East of LTD is an office complex known as Corporate 100. In the

northwest corner of Corporate 100's parking lot is a fenced area housing two mobile garbage Dumpsters. Monday through Friday, between 5 and 6:30 a.m., a garbage truck picks up the garbage from the Dumpsters. The garbage pickup lasts 5 to 10 minutes. The petitioners can hear the garbage truck's back-up warning beeper and the Dumpsters being lifted up and down. The petitioners can distinguish the noise from Corporate 100 and the noise from LTD. The petitioners are not disturbed by the noise from Corporate 100 because the noise is relatively infrequent and short in duration.

### 4. The Proposed Noise Wall and Other Proposed Noise Reduction Measures

In November 1997, LTD hired acoustical consultant Thomas Thunder to measure the noise from its staging and dock areas. Thunder reported that per his measurements, LTD was not exceeding the Board's numeric noise limits. However, LTD was exceeding the Board's impulse noise limits. Thunder recommended that LTD hire a dock pilot to inform arriving truck drivers to take steps to reduce noise. Thunder recommended that LTD instruct truck drivers to release the excess air from their air brakes before arriving. Thunder also recommended that LTD instruct their employees to be more careful when connecting and disconnecting the trailers. Finally, Thunder recommended that LTD build a 14-foot-tall noise wall near the retaining wall. Thunder recommended that LTD contact the Huff Company to obtain an estimate for such a wall.

In November 1998, Steven Mitchell, an employee with the Huff Company, provided LTD with an estimate for a 680-foot-long by 14-foot-tall noise wall, to be constructed near the retaining wall. The proposed wall would be five inches thick, with concrete caissons and acoustic wall panels. According to Mitchell, the wall would reduce the migration of noise from LTD. However, he could not guarantee that it would reduce the noise to a level that would satisfy the petitioners. The noise wall would not reduce noise from the tollway or the Corporate 100 office complex. LTD could save money if the wall were made with wood or reduced in height. The wall would cost approximately $300,000.

### C. The Interim Decision

On February 15, 2001, the Board issued an interim decision. The Board found that LTD had not violated any numeric or impulse noise limits, explaining that Thunder's measurements were not in compliance with its regulations. However, the Board did find that LTD violated the noise nuisance provisions of section 24 of the Act and section 900.102 of the Regulations.

In so concluding, the Board found that LTD had interfered with the petitioners' use and enjoyment of their homes. The Board found that the interference was unreasonable. The noise was substantial and frequent. The petitioners could not sleep, read, work, or study, had to keep their windows closed, could not use their decks and backyards, and sometimes felt vibrations.

The Board also found that although LTD was in the area before the petitioners moved into their homes, LTD had substantially increased its operation after the petitioners moved into their homes. Thus, the petitioners had priority of location. The Board found that several proposed noise reduction measures were reasonable for LTD. Finally, the Board found that despite efforts by LTD to abate noise, the noise problem had been ongoing for some time. The Board ordered a further hearing to determine appropriate remedies.

### D. The Remedies Hearing

Between October 15, 2002, and December 9, 2002, the Board conducted a hearing concerning remedies. Dr. Paul Schomer, an acoustical consultant, testified that he was hired by the petitioners to assess ways to mitigate the noise from LTD. Dr. Schomer has worked with Bannockburn officials on other community noise problems. Dr. Schomer concluded that a noise wall would eliminate the noise nuisance if it were built to reduce noise by 10 decibels at 1,000 hertz. The noise wall would have to be taller than previously estimated by Thunder and Mitchell, because the noise source was below grade and the petitioners' homes were two stories.

Dr. Schomer proposed that LTD erect a 250-foot-long by 25-foot-tall wall made of acoustical material. Dr. Schomer estimated that such a wall would cost $625,000. As an option, he proposed that the wall be built 400 feet long to reduce the noise from the tollway and Lakeside Drive. Dr. Schomer recommended that the wall be built near the retaining wall, because the retaining wall is close to the noise source. Although the wall would eliminate the nuisance, Dr. Schomer could not guarantee that the petitioners would be satisfied with the amount of noise reduction.

Dr. Schomer also suggested that LTD disconnect the yard tractor's back-up warning beeper. LTD could also stop trucks from idling on Lakeside Drive while waiting to enter the staging and dock areas. Finally, another option was to stop nighttime operations.

Edward Anderson, a licensed professional engineer hired by LTD, testified that he did not recommend building a noise wall near the retaining wall. The retaining wall was supported with underground mesh fabric. Any structure built in the retaining wall's zone of influ-

ence would affect the integrity of the retaining wall. A new retaining wall could cost $1.5 million or more. Anderson testified that the noise wall should be built by the property line, although a noise wall by the property line would eliminate 35 to 40 parking spaces from LTD's parking lot.

Following Anderson, Dr. Schomer testified that a noise wall built at the property line would need to be taller than 25 feet to be effective.

Thunder testified that once a noise wall reaches over 15 feet, it is not aesthetically pleasing, has structural difficulties, and is not cost effective. Thunder testified that a noise wall could be built at the property line. A noise wall built at the property line would reduce noise, although it would be less effective than if built near the retaining wall. Thunder testified that the wall could be made of wood or brick rather than acoustical material. However, Thunder did not propose an alternative wall to the one proposed by Dr. Schomer.

David Lothspeich, a former manager for Bannockburn, testified that Bannockburn's zoning code permitted fences to be no more than six feet tall. Variances of up to 20% could be granted. If LTD wanted to build a 25-foot-tall noise wall, it would need to obtain a text amendment to the zoning code.

Jack Voight, vice president for LTD, testified that LTD would be willing to disconnect the back-up beeper from the yard tractor and hire a dock pilot. Voight also testified that as of October 18, 2001, LTD was temporarily shutting down second-shift operations in Bannockburn because it had opened a facility in Naperville, Illinois. However, LTD would restart second-shift operations at the Bannockburn facility if business demanded.

### E. The Remedies Decision

On July 24, 2003, and February 5, 2004, the Board entered orders concerning remedies. The Board ordered that (1) LTD cease trucking operations at its Bannockburn facility between the hours of 10 p.m. and 6 a.m.; (2) LTD disconnect the back-up beeper on its yard tractor and replace it with a human spotter or strobe light; and (3) LTD cease from parking, standing, or idling trucks on Lakeside Drive or the ramp connecting the dock area with Lakeside Drive. The Board also ordered that if LTD constructed a noise wall made of acoustical material that effectively eliminated the noise nuisance, the above three restrictions would not apply. Finally, the Board ordered that LTD pay a civil penalty of $15,000. Thereafter, LTD filed a timely notice of appeal.

### II. DISCUSSION

■ Before addressing the merits of LTD's appeal, we note that in

its brief LTD requests to supplement the record with evidence concerning the sale of the Rosenstrock home, which was recently sold for a substantial gain. Because this information is not pertinent to the disposition of the issues on appeal, we deny this request.

We turn now to LTD's contentions. LTD contends that (1) section 24 of the Act and section 900.102 of the Regulations do not provide for an independent cause of action; (2) the Board erred in finding that LTD was a noise nuisance; (3) the Board erred in ordering LTD to shut down nighttime operations; (4) the Board erred in ordering LTD to disconnect the back-up beeper on the yard tractor; and (5) the Board erred in fining LTD $15,000.

We first address whether the petitioners have an enforceable cause of action. Questions involving statutory interpretation, such as the question at issue, are reviewed *de novo*. *Du Page County Election Comm'n v. State Board of Elections*, 345 Ill. App. 3d 200, 206 (2003). The fundamental rule of statutory interpretation is to ascertain and give effect to the intent of the legislature. *Shields v. Judges' Retirement System*, 204 Ill. 2d 488, 493-94 (2003). The best evidence of legislative intent is the language employed in the statute itself, which must be given its plain and ordinary meaning. *Allstate Insurance Co. v. Menards, Inc.*, 202 Ill. 2d 586, 591 (2002). Where the statutory language is clear and unambiguous, a court must give it effect without resort to other aids of construction. *Boylan v. Matejka*, 331 Ill. App. 3d 96, 98-99 (2002).

■ The Act regulates various types of pollution, including noise pollution. Specifically, title VI of the Act prohibits the creation of noise pollution. The overall purpose of this title is "to prevent noise which creates a public nuisance." 415 ILCS 5/23 (West 2002). In enacting this title, the General Assembly found that "excessive noise endangers physical and emotional health and well-being, interferes with legitimate business and recreational activities, increases construction costs, depresses property values, offends the senses, creates public nuisances, and in other respects reduces the quality of our environment." 415 ILCS 5/23 (West 2002).

■ Section 24 of the Act provides: "No person shall emit beyond the boundaries of his property any noise that unreasonably interferes with the enjoyment of life or with any lawful business activity, so as to violate any regulation or standard adopted by the Board under this Act." 415 ILCS 5/24 (West 2002). Section 25 of the Act grants the Board the authority to prescribe regulations on noise control. 415 ILCS 5/25 (West 2002). The Board has adopted several such regulations. See 35 Ill. Adm. Code § 900.101 *et seq.* (2002). Section 900.102 of the Regulations, entitled "Prohibition of Noise Pollution," states in

pertinent part: "No person shall cause or allow the emission of sound beyond the boundaries of his property, as property is defined in Section 25 of the Illinois Environmental Protection Act, so as to cause noise pollution in Illinois, or so as to violate any provision of this Chapter." 35 Ill. Adm. Code § 900.102 (2002). Other sections of the Regulations set specific numeric noise emission limits or set standards by which to measure noise emissions.

There is no specific provision in the Act or the Regulations that explicitly grants private complainants a cause of action under section 24 of the Act or section 900.102 of the Regulations. However, Illinois courts have consistently interpreted these provisions as allowing private complainants to initiate noise pollution actions before the Board. See *Illinois Coal Operators Ass'n v. Pollution Control Board*, 59 Ill. 2d 305, 310-12 (1974); *Discovery South Group, Ltd. v. Pollution Control Board*, 275 Ill. App. 3d 547, 550-56 (1995); *Ferndale Heights Utilities Co. v. Pollution Control Board*, 44 Ill. App. 3d 962, 967-68 (1976).

A complainant can establish a noise pollution violation in one of two ways. One, the complainant may present noise emission measurements that prove the alleged polluter has exceeded the specific numeric noise limits as prescribed in the Regulations. Two, the complainant may prove that the noise emissions from the alleged polluter are a nuisance in that they unreasonably interfere with the enjoyment of life. See, *e.g.*, *Illinois Coal Operators*, 59 Ill. 2d at 310-12; *Discovery South Group*, 275 Ill. App. 3d at 550-56; *Ferndale Heights Utilities*, 44 Ill. App. 3d at 967-68. Section 900.102 of the Regulations, in conjunction with section 24 of the Act, "prohibits emissions that unreasonably interfere with life or activities whether such emissions violate \*\*\* a particular [numeric noise limit]." *Shell Oil Co. v. Pollution Control Board*, 37 Ill. App. 3d 264, 269 (1976). We hold, consistent with the above-cited cases, that private citizens can maintain causes of action before the Board for violations of section 24 of the Act and section 900.102 of the Regulations.

In so ruling, we find *Shepard v. Pollution Control Board*, 272 Ill. App. 3d 764, 768 (1995), relied upon by LTD, to be inapplicable to the present case. In *Shepard*, the court stated, "section 24 provides no general cause of action under the Act." *Shepard*, 272 Ill. App. 3d at 768. LTD takes the *Shepard* court's statement out of context. A careful read of the entire *Shepard* case reveals that the petitioner lacked a cause of action because the alleged noise polluter was a skeet and trap range. See *Shepard*, 272 Ill. App. 3d at 768-70. Organized amateur and professional sporting activities are exempt from adhering to the Board's noise standards. 415 ILCS 5/25 (West 2002); *Shepard*, 272 Ill. App. 3d at 769-70.

■ LTD's next contention on ·appeal is that the Board erred in finding that LTD was a noise nuisance. The standard by which this court reviews a decision of an administrative agency is the manifest weight standard. *Wells Manufacturing Co. v. Pollution Control Board,* 73 Ill. 2d 226, 234 (1978); *Discovery South Group,* 275 Ill. App. 3d at 552. An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Discovery South Group,* 275 Ill. App. 3d at 552. A decision is not against the manifest weight of the evidence and must be affirmed if any evidence fairly supports the determination of the administrative agency. *Discovery South Group,* 275 Ill. App. 3d at 552. The reviewing court must not reweigh the evidence or make an independent determination of the facts. The mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings. *Discovery South Group,* 275 Ill. App. 3d at 553. If the record contains evidence to support the agency's decision, it should be affirmed. *Discovery South Group,* 275 Ill. App. 3d at 553.

■ Noise emissions are a noise nuisance if the noise interferes with the complainant's enjoyment of life and the interference is unreasonable. *Illinois Coal Operators,* 59 Ill. 2d at 310-12; *Discovery South Group,* 275 Ill. App. 3d at 550-56; *Ferndale Heights Utilities,* 44 Ill. App. 3d at 967-68. The principal difficulty in determining whether noise emissions constitute a nuisance lies in defining the level at which interference becomes unreasonable. The Board must balance the costs and benefits of abatement in an effort to distinguish " 'the trifling inconvenience, petty annoyance or minor discomfort' " from a " 'substantial interference with the enjoyment of life and property.' " *Wells Manufacturing Co.,* 73 Ill. 2d at 232, quoting *Processing & Books, Inc. v. Pollution Control Board,* 64 Ill. 2d 68, 77 (1976).

■ The Act provides several salient factors to consider in determining whether interference is unreasonable.

> "In making its orders and determinations, the Board shall take into consideration all the facts and circumstances bearing upon the reasonableness of the emissions, discharges or deposits involved including, but not limited to:
>
>   (i) the character and degree of injury to, or interference with the protection of the health, general welfare and physical property of the people;
>
>   (ii) the social and economic value of the pollution source;
>
>   (iii) the suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved;

(iv) the technical practicability and economic reasonableness of reducing or eliminating the emissions, discharges or deposits resulting from such pollution source; and

(v) any subsequent compliance." 415 ILCS 5/33(c) (West 2002).

■ In the present case, the Board determined that the noise emissions from LTD interfered with the petitioners' enjoyment of life. The evidence admitted at trial supports the Board's determination. LTD's noise emissions made it difficult for the petitioners and their families to sleep, read, study, or work. The petitioners could not open their windows or enjoy their backyards and patios. Some of the petitioners felt vibrations in their homes. The vibrations caused one petitioner's chandelier to fall.

LTD argues that the overwhelming ambient noise in the area from the tollway and the Corporate 100 complex precludes a determination that the petitioners were disturbed by the noise from LTD. However, evidence admitted at trial established that although the noise from the tollway and the Corporate 100 complex was prevalent, those areas were not the source of the noise that disturbed the petitioners. The tollway noise is a constant, white noise known as a broadband noise, which the human ear can become accustomed to over time. The noise from the Corporate 100 complex is infrequent and occurs only at certain times. The petitioners testified that they could distinguish the LTD noise from other area noise.

After applying the salient section 33 factors, the Board also determined that the interference was unreasonable. Again, the evidence admitted at trial supports the Board's determination. The second factor, the social and economic value of the pollution source, weighs in favor of LTD. LTD employs a good number of people and provides the community with substantial tax revenue. However, the remaining factors weigh against LTD.

The first factor, the character and degree of injury to or interference with the protection of the health, general welfare, and physical property of the people, weighs against LTD. The noise was substantial and frequent. It could be heard through closed windows. It occurred six days a week and at all hours of the night. The noise affected the petitioners' moods. It caused them to be irritable, tired, and crabby.

The third factor, the suitability or unsuitability of the pollution source to the area in which it is located, weighs against LTD. Although LTD seemingly had priority of location, LTD greatly increased its trucking operation over the years. When the petitioners moved into their homes, LTD's warehouse was 100,000 square feet with eight truck docks. By 1995, LTD had expanded its warehouse to 400,000 square feet and 26 truck docks. Thus, while LTD's warehouse was

once suitable to its location, its expansion and increase in business caused it to become unsuitable. See *Wells Manufacturing Co.*, 73 Ill. 2d at 236-37.

The fourth factor also weighs against LTD. Several noise abatement alternatives would be practically and economically reasonable for LTD. In its decision, the Board noted one alternative in particular. LTD could hire one or more dock pilots. The dock pilots would eliminate the need for the back-up beeper on the yard tractor. The dock pilots could ensure that trailers do not hit the retaining wall bumpers. They could also patrol the staging and dock areas to ensure that truck drivers take proper steps to reduce noise.

Finally, although close, the final factor weighs against LTD. LTD did take several measures in an attempt to comply with the Act and the Regulations. Despite LTD's efforts, however, the evidence reveals that the noise problems were still ongoing at the time of the hearing, primarily due to LTD's refusal to disconnect the back-up beeper on the yard tractor.

In sum, the evidence admitted at trial supports the Board's determination that the noise emissions from LTD interfered with the petitioners' enjoyment of life and that the interference was unreasonable. As such, we cannot find the Board's determination that LTD was a noise nuisance to be against the manifest weight of the evidence.

LTD's next series of contentions concern whether the remedies the Board ordered were proper. LTD argues that the Board erred in ordering it to shut down its nighttime operations at the Bannockburn facility and to disconnect the back-up beeper on its yard tractor unless it built a noise wall. LTD also argues that the Board erred in imposing a fine of $15,000.

■ Section 33 of the Act vests the Board with wide discretion in fashioning a remedy. In particular, this section provides:

> "(a) *** [T]he Board shall issue and enter such final order, or make such final determination, as it shall deem appropriate under the circumstances. ***
>
> (b) Such order may include a direction to cease and desist from violations of the Act or of the Board's rules and regulations or of any permit or term or condition thereof, and/or the imposition by the Board of civil penalties in accord with Section 42 of this Act." 415 ILCS 5/33 (West 2002).

The principal reason for penalties is to aid in enforcement; punitive considerations are secondary. *Tri-County Landfill Co. v. Pollution Control Board*, 41 Ill. App. 3d 249, 259 (1976). While the Board is vested with broad discretionary powers in imposing penalties, the assessment may not be arbitrary. *Tri-County Landfill*, 41 Ill. App. 3d at

259. The imposition of a penalty must be supported by some reasonable factor appearing in the record. *Tri-County Landfill*, 41 Ill. App. 3d at 259.

■ The remedies ordered by the Board were not unreasonable or arbitrary. The Board's order to cease nighttime operations was practical and reasonable. The petitioners and their families were being disturbed primarily during the nighttime hours. They found it hard to fall asleep and stay asleep. Ceasing nighttime operations would eliminate noise during late night and early morning hours. We note that Michael Hara, LTD's chief operating officer, testified that if LTD were prohibited from running a second shift, "it would destroy the business." However, at the time of the remedies hearing, LTD was not even operating a second shift out of its Bannockburn facility because it had acquired a new facility in Naperville.

The order to disconnect the back-up beeper on the yard tractor in favor of a dock pilot was also reasonable and practical. A good portion of the noise disturbing the petitioners and their families stemmed from the back-up beeper on the yard tractor. A dock pilot would remedy the noise from the back-up beeper and would do so at a relatively low cost to LTD. We note that at the remedies hearing, Jack Voight, a vice president of LTD, voluntarily agreed to take this measure.

Contrary to LTD's assertion otherwise, disconnecting the back-up beeper from the yard tractor would not cause LTD to violate federal law. The applicable federal regulation requires as follows:

"No employer shall use any motor vehicle equipment having an obstructed view to the rear unless:

(i) The vehicle has a reverse signal alarm audible above the surrounding noise level or:

(ii) The vehicle is backed up only when an observer signals that it is safe to do so." 29 C.F.R. § 1926.601(b)(4) (2002).

Clearly, the federal regulation allows LTD to use an alarm *or* a human observer.

The Board provided LTD with a viable alternative to shutting down second-shift operations and disconnecting the yard tractor's back-up beeper. In lieu of taking the above measures, the Board ordered that LTD could build a noise wall. The noise wall could be built near the retaining wall or near the property line. It must be made of acoustical material and eliminate the noise nuisance.

LTD argues that such a wall would not be economically feasible and would not be possible due to Bannockburn's zoning code. We emphasize that LTD need not construct a noise wall. The Board did not require that it do so. However, if it decides that building such a

wall would be in its best business interest and it is able to obtain an ordinance text amendment or a variance from Bannockburn, it may do so.

LTD argues that it was unfairly taken by surprise when the Board entered its order allowing LTD this alternative and that, consequently, its due process rights were violated. We disagree that LTD was surprised. On the contrary, LTD was given notice and ample opportunity to present evidence regarding the propriety of a noise wall.

In its February 15, 2001, order, the Board ordered a separate hearing regarding remedies. The Board specifically stated in that order that one of the remedies it would be considering was a noise wall. The Board also stated that it wanted to hear more evidence on the types of noise walls and their effectiveness. The Board held its remedy hearing between October 15, 2002, and December 9, 2002. LTD had an opportunity to present its evidence at this hearing.

■ Finally, LTD argues that the $15,000 fine was excessive. The Board may impose a civil penalty of up to $50,000 for any violation and may impose an additional $10,000 per day for each day the violation continues. 415 ILCS 5/42(a) (West 2002). The Act outlines several factors for the Board to consider when imposing a fine. These factors are:

"(1) the duration and gravity of the violation;

(2) the presence or absence of due diligence on the part of the violator in attempting to comply with requirements of this Act and regulations thereunder or to secure relief therefrom as provided by this Act;

(3) any economic benefits accrued by the violator because of delay in compliance with requirements;

(4) the amount of monetary penalty which will serve to deter further violations by the violator and to otherwise aid in enhancing voluntary compliance with this Act by the violator and other persons similarly subject to the Act; and

(5) the number, proximity in time, and gravity of previously adjudicated violations of this Act by the violator." 415 ILCS 5/42(h) (West 2002).

In the present case, the Board considered the appropriate factors in assessing the fine. Particularly, the Board considered that LTD had taken several measures to abate noise. However, the Board also considered that there were several other measures that LTD could have taken but did not. The Board also considered that the disruptive noise was severe, lasted over a span of several years, and occurred frequently. Additionally, the Board considered the need to deter LTD from further violations. Because the Board considered the appropriate

factors in assessing the fine, we do not believe that its determination was unreasonable.

## III. CONCLUSION

For the foregoing reasons, the judgment of the Illinois Pollution Control Board is affirmed.

Affirmed.

BOWMAN and KAPALA, JJ., concur.